UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

VICTOR BENITEZ,

        Petitioner,

        v.                                  Case No. 17-C-1578

WARDEN CHRIS BUESGEN,

        Respondent.

---

### DECISION AND ORDER DENYING HABEAS PETITION

---

On November 12, 2017, Petitioner Victor Benitez filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his state court conviction for various crimes arising out of an automobile crash that resulted in four fatalities for which he is presently under a sentence of confinement. At Petitioner's request, the § 2254 petition was stayed for a substantial period of time to permit him to complete state proceedings. The case was reassigned several times before a screening order on an amended petition was finally entered on August 21, 2023. Upon Respondent's appearance, the case was reassigned to the undersigned on September 8, 2023. Respondent thereafter filed a motion to dismiss, which the court partially granted. The court thereafter ordered briefing on the remaining claims. For the reasons that follow, the petition is denied.

### BACKGROUND

On February 18, 2012, a vehicle traveling at high speeds crossed railroad tracks and went airborne, eventually hitting a utility pole and flipping over. Four of the five occupants died, and the fifth—Petitioner—walked away from the scene into a nearby marsh. He was eventually

located and taken to a nearby hospital. Blood tests revealed a blood alcohol level of .03 and benzoylecgonine, a metabolite of cocaine.

The State charged Petitioner with four counts of homicide by intoxicated use of a vehicle; four counts of homicide by operating a vehicle with a restricted controlled substance in his blood; four counts of operating without a valid driver's license causing death; four counts of hit and run involving death; and one count of obstructing an officer.

Petitioner's seven-day jury trial began on March 4, 2013. Several pieces of testimony from the State's case-in-chief are relevant to the current petition. The State called Molly Ross, a toxicologist from the State Crime Lab. Dkt. No. 2-5 at 93. Ross testified that Petitioner's blood test returned a blood alcohol concentration (BAC) of .036. *Id*. at 104. She also testified regarding a methodology called "retrograde extrapolation," which she explained is a process that uses a person's BAC to estimate back to an earlier time. *Id*. at 107. Using this analysis, Ross testified that—assuming Petitioner's BAC was .036 at 8:30 p.m.—she estimated a BAC range of .071 to .123 with an average of .088 at the time of the crash (assuming Petitioner did not drink in between the two times). *Id*. at 108.

On cross-examination, Petitioner's trial counsel probed Ross's retrograde extrapolation. She admitted that she was making "a couple of assumptions," such as no drinking after 5:00 p.m., a blood test at 8:30 p.m., and a patient weight of 136 pounds. *Id*. And she admitted that there are "many" factors that can impact a BAC result. *Id*.

The State also called another toxicologist from the State Crime Lab, Amy Goedert. She testified that she tested Petitioner's blood for THC. Dkt. No. 2-6 at 48. The test returned a result showing heightened levels of delta-9, the psychoactive part of marijuana that causes behavioral changes and impairing effects. *Id*. at 53. Relevant to this evidence, Petitioner's trial counsel had

2

sent the blood sample out of state to be retested by an independent lab. Dkt. No. 26-9 at 28. The retest showed zero levels of delta-9. *Id*. at 31. But trial counsel did not introduce this evidence at trial. The record reveals that, prior to trial, he had attempted to arrange for a toxicologist from the independent lab to testify via video. Dkt. No. 2-1 at 6. The trial court denied that motion. *Id*.

Once the State rested, Petitioner presented his case. His main defense at trial was that the State failed to prove he was the one driving the car. He called the State's accident reconstructionist, Trooper Ryan Zukowski, who testified that there was "insufficient scientific evidence to determine who was driving" the car. Dkt. No. 2-11 at 66. He also called Ruth Henk, a State Crime Lab analyst in the trace evidence unit, who testified that the fibers found on the driver's seat airbag were inconsistent with Petitioner's clothing worn that night and that, instead, his clothing fibers were consistent with those found on the passenger's side airbag. Dkt. No. 2-11 at 24–25. On cross-examination, she conceded that trace material might get tossed around in a rollover accident. *Id*. at 28. She acknowledged that—as compared to a head-on collision—trace evidence in a rollover "would be less reliable" to determine driver placement just before the crash. *Id*. at 26. At closing, the State argued that it made "perfect sense" that fibers from Petitioner's shirt were found on the passenger side airbag given the evidence that the driver was thrown to that side of the car and the evidence that Petitioner had "crawled through the passenger side" to exit the car after the crash. Dkt. No. 26-5 at ¶ 8.

Relevant to the State's hit and run charges, Petitioner called Dr. Kenneth Kudsk, a trauma surgeon who treated Petitioner. During his direct examination, Petitioner's trial counsel used his medical records to refresh the doctor's recollection. Dkt. No. 2-11 at 13. Based off these records, Dr. Kudsk testified that Petitioner "appeared confused, so I imagine there was some sort of a head injury that rattled him." *Id*. at 12. On cross-examination, the State had the doctor look at the

3

medical records which indicated Petitioner's BAC when he arrived at the hospital. *Id*. at 19. It read .10. *Id*.

In the end, the jury convicted Petitioner on four counts of homicide by intoxicated use of a vehicle, four counts of homicide by driving with a restricted controlled substance in the blood, four counts of operating a motor vehicle without a valid license causing death, and one count of obstructing an officer. Dkt. No. 2-13 at 10–13. It acquitted him on four counts of hit and run causing death. *Id*. at 11–12.

Petitioner appealed, arguing that his counsel was ineffective for failing to object to a jury view of the car, to an expert report, and to Zukowski's testimony (during the State's case-in-chief). *See State v. Benitez*, No. 2015AP1602-CR, unpublished slip op. (Wis. Ct. App. July 14, 2016). The court of appeals affirmed. *See id*. Petitioner then petitioned the Wisconsin Supreme Court for review, which it denied on November 14, 2016. Dkt. No. 35-2.

Petitioner obtained new counsel and filed the present action on November 12, 2017. Dkt. No. 1. The very next day, he moved to stay this proceeding. Dkt. No. 5. He explained that, while some of his constitutional claims had reached their endpoint, his former counsel had "overlooked" other claims that had not previously been raised. *Id*. at 2. The court granted the request on February 14, 2018, staying the case while Petitioner exhausted his state remedies as to the additional claims. Dkt. No. 9.

Petitioner thereafter filed a Wis. Stat. § 974.06 postconviction motion and motion for postconviction discovery on August 14, 2018. Petitioner argued in a fifty-page brief that his trial counsel was ineffective for (1) improperly handling Henk's testimony about airbag fibers; (2) several missteps related to the toxicology evidence; (3) failure to seek suppression of his

statements made to the police; and (4) failure to challenge the legality of his arrest. Dkt. No. 26-1. The trial court denied that motion on October 2, 2019. Dkt. No. 26-3.

Petitioner appealed, and the court of appeals affirmed in full. *See State v. Benitez*, No. 2020AP55, unpublished slip op. (Wis. Ct. App. Oct. 14, 2021) (per curiam). He then petitioned the Wisconsin Supreme Court for review, which it denied on February 16, 2022. Dkt. No. 35-4.

Petitioner moved to lift the stay in this court, which was granted on July 5, 2023. Dkt. No. 23. He filed an amended petition on August 17, 2023, raising the four issues identified in the second postconviction motion. Respondent thereafter filed a motion to dismiss, which the court granted as to two of the four claims, leaving only the claims of ineffective assistance of counsel relating to the airbag fiber and toxicology issues that will be decided below. Dkt. No. 42.

## LEGAL STANDARD

This petition is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254. Under AEDPA, a federal court may grant habeas relief only when a state court's decision on the merits was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by" decisions from the Supreme Court, or was "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d); *see also Woods v. Donald*, 575 U.S. 312, 315–16 (2015). A state court decision is "contrary to . . . clearly established Federal law" if the court did not apply the proper legal rule, or, in applying the proper legal rule, reached the opposite result as the Supreme Court on "materially indistinguishable" facts. *Brown v. Payton*, 544 U.S. 133, 141 (2005). A state court decision is an "unreasonable application of . . . clearly established Federal law" when the court applied Supreme Court precedent in "an objectively unreasonable manner." *Id.* That is, and was meant to be, an "intentionally" difficult standard to meet. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well

5

understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

ADEPA is not the only mechanism supplying deference here. Petitioner's claims allege ineffective assistance of counsel, requiring him to "show that his counsel rendered deficient performance and that the deficiency prejudice him." *Rogers v. Wells*, 96 F.4th 1006, 1012 (7th Cir. 2024). This is no easy standard to meet—ineffective assistance claims are "difficult to prove" because "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 1011 (quoting another source) (cleaned up). For this reason, when a prisoner brings ineffective assistance claims under ADEPA, federal courts "engage in a doubly deferential review." *Id*. Not only is counsel entitled to deference, but so is the state court that reviewed the ineffective assistance claims in the first place. *See id*. ("Accordingly, for ineffective assistance claims there is a steep hill to climb, and under § 2254(d), that hill is even steeper.").

## ANALYSIS

Petitioner asserts two theories that his counsel was ineffective. The first relates to the airbag fiber evidence and the second relates to the toxicology issues. The court will address each in turn.

**A. Airbag Fiber Evidence**

Petitioner's first claim is that his trial counsel rendered ineffective assistance related to the airbag fiber evidence. Overall, Petitioner's theory is this—the fact that the fibers on his t-shirt matched those found on the passenger-side airbag should have doomed the State's case from the start. Specifically, he faults trial counsel for failing to call an expert and failing to handle Heck's testimony properly.

6

Neither win the day. As for the expert, Petitioner points to the testimony of Zachary Bingen at the *Machner* hearing. Bingen—a mechanical engineer—testified that anything "found on the passenger airbag would be consistent with fibers, materials, whatever from the passenger." Dkt. No. 26-2 at 88. But Bingen conceded he was not a "fiber analyst or a trace evidence analyst" and that he had "never actually compared fibers" or even "removed fibers off a dirty airbag." *Id*. at 89–90. He noted that he is "not somebody who does this kind of analysis with fibers." *Id*. at 94. More to the point, Bingen also conceded that he never reviewed Henk's report. *Id*. at 91. And he acknowledged that there are "multiple ways" in which fibers could be deposited on an airbag. *Id*. at 90.

Moreover, Petitioner does not give enough credence to trial counsel's strategy. Trial counsel's approach was to poke holes in the State's driver-identity theory. The accident reconstructionist could not determine who was driving, and Henk (who was actually qualified in trace material analysis) testified that fibers from Petitioner's t-shirt were consistent with those found on the passenger airbag. Calling a mechanical engineer who was neither qualified in, nor experienced with, trace evidence analysis, who also admitted on cross-examination that anything that contacts the airbag could deposit fiber, would not have changed much. For this reason, the court of appeals' conclusion that failing to call Bingen was not deficient performance was not unreasonable.

The same can be said for the court of appeals' conclusion regarding trial counsel's handling of Henk's testimony. As noted above, trial counsel's approach was to use driver identity to cast doubt upon the State's case. In light of this strategy, trial counsel testified at the *Machner* hearing that he did not object to Henk's testimony regarding how the driver's clothing fibers might have ended up on the passenger airbag because he did not find it "very credible." *Id.* at 22. Indeed, he

7

argued in closing that Henk's testimony "did not mean beyond a certainty that that placed him in the passenger seat. She did not say that. She said it's consistent with, which means it's a possible source. Possible." *Id*. at 51. He went on to say that "when it's all said and done, you heard from Ms. Henk, there was no evidence to be taken from the air bags. None. None. Now, that's unfortunate because that was our best source of evidence to try to go ahead and put people within the vehicle and indicate placement." *Id*.

This closing reflects a clear and reasonable strategy based on the facts of the case. Doubt would be first raised by the fact that the State's reconstructionist could not conclude who was driving, and then that doubt strengthened with Henk's testimony regarding the fibers. In other words, Henk's testimony was not needed to *prove* that Petitioner was the passenger—it was used to cast doubt upon and disprove the State's theory that he was the driver. For this reason, also, the court of appeals' conclusion that trial counsel's cross-examination of Henk was not constitutionally deficient was not unreasonable.

**B. Toxicology**

Petitioner also faults trial counsel for his handling of several toxicology issues. He argues that trial counsel was unprepared to challenge the highly speculative retrograde extrapolation; should not have called Dr. Kudsk; and mishandled the toxicology issues regarding THC metabolites. The court of appeals concluded that trial counsel was not deficient because he chose to focus on driver identity, not toxicology. This, too, was not an unreasonable conclusion, especially in light of the evidence of the other intoxicating drugs found in Petitioner's blood.

In denying Petitioner's postconviction motion after the *Machner* hearing, the circuit court explained why Petitioner's after-the-fact toxicology arguments do not show a deficiency:

> Here, the advocacy of trial counsel served to support the insistent claim of the defendant that he simply was not the driver. Ultimately, Smerlinski made the choice

8

> to communicate to the jury in a manner which they would understand; because, although lawyers and judges may recognize the utility of arguing in the alternative, to a factfinding, truth-seeking, citizen juror, such a narrative is likely to be perceived as disingenuous and deceitful. Smerlinski testified that although he did poke and test some of the state's evidence on these other issues, he decidedly made the strategic decision to more narrowly focus the defense at trial to conform to the defendant's claim that he was not the driver. His decision was not unreasonable.

Dkt. No. 26-3 at 3.[1] The court of appeals came to the same conclusion. Because trial counsel zeroed-in on the driver identity issue, the toxicology issues became less important. For this reason alone, the court of appeals' conclusion was not unreasonable.

Petitioner likewise cannot show a deficiency as to each of the three alleged failures. He faults trial counsel for not challenging the toxicologist's retrograde extrapolation because it was based only upon a single data point (that Petitioner had a BAC of .03 when he arrived at the hospital). In his view, trial counsel should have sought to have this testimony excluded via a *Daubert* challenge or otherwise more vigorously challenged it on cross-examination. As for the *Daubert* issue, Wisconsin courts have upheld admission of retrograde extrapolation based upon a similar amount of information. *See State v. Giese*, 2014 WI App 92, ¶¶ 24–28, 356 Wis. 2d 796, 854 N.W.2d 687. Moreover, trial counsel extensively challenged the toxicologist on cross-examination regarding the "assumptions" she had made and how it affected her overall conclusions. *See* Dkt. No. 2-6 at 8–12. It is not as if trial counsel let the extrapolation issue go; he made it plain to the jury that the toxicologist's conclusions were based on very limited data, and she was making many assumptions regarding her estimation of Petitioner's BAC at the time

---

[1] Petitioner claims that this general approach was an illusion the trial court pulled out of thin air at the *Machner* hearing. Dkt. No. 44 at 22. The record says otherwise. Trial counsel began his closing argument discussing driver placement, and testified at the *Machner* hearing that he was "interested in any evidence that would not place my client in the driver's seat. That was really what my focal point was." Dkt. No. 26-2 at 43. It is also worth noting that the very circuit court judge who presided over the trial decided the postconviction motion.

9

of the accident. Perhaps Petitioner's current counsel would have crossed the toxicologist using different questions, but that does not negate the fact that trial counsel took the same approach. Again, trial counsel's approach made sense in light of the fact that there were other drugs found in Petitioner's blood and the nature and circumstances of the crash itself constituted strong evidence that whoever was driving was severely impaired.

As for calling Dr. Kudsk, Petitioner faults trial counsel because the witness wound up testifying that Petitioner had a .10 BAC at the hospital (which lined up with what the toxicologist predicted). But the doctor testified that Petitioner "appeared confused, so I imagine there was some sort of a head injury that rattled him." Dkt. No. 2-11 at 12. During closings, trial counsel specifically attacked the hit and run charges, urging the jury to ask whether Petitioner had "the mental ability to even recognize that people had been dead, let alone any of his statutory duties to go ahead and have to attend to them after the crash." Dkt. No. 2-12 at 61. That plan worked— the jury acquitted him on those very charges. The trial court later noted that Petitioner "was spared the exposure of an additional 100 years in prison and $400,000.00 in fines" as a result of trial counsel's efforts, including Dr. Kudsk's testimony. Dkt. No. 26-3 at 4. And the court of appeals held similarly, calling Petitioner's after-the-fact arguments "more Monday-morning-quarterbacking by postconviction counsel." *Benitez*, No. 2020AP55, ¶ 31. This court agrees.

Finally, Petitioner argues that his trial counsel was deficient for not introducing evidence contradicting the State's blood test that Petitioner had delta-9 metabolites in his blood. Petitioner contends that his trial counsel had engaged an independent lab to retest the blood sample, which reported no delta-9 metabolites. In his eyes, trial counsel should have produced the toxicologist who prepared the report, and the failure to do so was deficient performance.

The court of appeals' conclusion to the contrary was not unreasonable. First, it is important to recall the context of the trial. As trial counsel later testified, Petitioner retained him and that meant Petitioner (and/or his family) would need to pay for experts. Dkt. No. 26-2 at 67. The expert toxicologist lived in New Hampshire, meaning Petitioner would have to pay for his travel and time. *Id*. And as noted above, THC was only one of the intoxicating substances found in Petitioner's blood. Trial counsel factored all this into his trial strategy and in deciding whether to call the toxicologist. *Id*.

Indeed, he even said so the first day of trial. Before jury selection, the court discussed several housekeeping matters with the attorneys—one of which was Petitioner's motion to allow the toxicologist to testify via telephone or video conferencing. Dkt. No. 2-1 at 5. The court specifically noted the financial aspect of trial counsel's strategic decision:

> Trial Court: I understand that it's an expensive proposition hauling people in from out of state and the like, and I know that the defendant's resources are not unlimited and indeed probably to the contrary. They're probably quite limited. But, in making those strategic decisions as to what witnesses to call and what experts to evaluate and all that, money is always a factor; right?
>
> Defense Counsel: It sure is.

*Id.* at 6.

Context aside, the court of appeals reasonably noted—as trial counsel did at the *Machner* hearing—that the toxicologist's testimony could not alter the fact that benzoylecgonine (a cocaine metabolite) was undisputedly found in Petitioner's blood. *Benitez*, No. 2020AP55, ¶ 31; Dkt. No. 26-2 at 68 ("Question: But you knew even with [the negative delta-9 re-test] there was still benzoylecgonine, a metabolite of cocaine, in the defendant's blood; correct? Answer: That's true."). As the court of appeals noted, this made the delta-9 re-test less consequential. *Benitez*,

11

No. 2020AP55, ¶ 31. For these reasons, the court of appeals' conclusion regarding the toxicology expert was neither contrary to, nor an unreasonable application of, clearly established federal law.

## CONCLUSION

As the saying goes, hindsight is 20/20. In other words, it is easier to analyze an event after it has happened rather than in its midst. So too here. With the passage of a decade's time, Petitioner faults his trial counsel for decisions he made at every turn. But the constitution does not guarantee a perfect, or even very good, attorney. *Anderson v. United States*, 94 F.4th 564, 581 (7th Cir. 2024). Rather, one is simply afforded a reasonably effective attorney. The court of appeals did not unreasonably apply clearly established federal law when it held Petitioner's trial counsel performed adequately and that no violation of his Sixth Amendment right to the effective assistance of counsel had been shown.

Accordingly, the petition for writ of habeas corpus is **DENIED**, and the Clerk is directed to enter judgment dismissing the case. A certificate of appealability is also **DENIED**. The court does not believe that reasonable jurists would find that Petitioner has made a substantial showing of the denial of a constitutional right. Petitioner is further advised that this order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. *See* Fed. R. App. P. 3, 4.

**SO ORDERED** at Green Bay, Wisconsin this 9th day of December, 2024.

s/ William C. Griesbach  
William C. Griesbach  
United States District Judge